EMERY *v.* THE ATLANTA REAL ESTATE EXCHANGE.

1. A contract between the owner of real estate and a real estate broker in these terms, "I will offer the place at $11,250 net until 10 May, 1890, (signed) H. F. Emery"; "We accept the above at $11,250 net upon condition that sale is perfected, (signed) J. H. Mountain, Magr.," construed in the light of the parol evidence, imports an undertaking by the broker to furnish a purchaser, if he can do so, who will pay $11,250 *cash* for the property, or more than that sum; and on the part of the owner, that he will accept such purchaser and convey to him the property on receipt of the net price specified. The difference between that price and what the purchaser would pay, would be the compensation of the broker for his services. The time for completing the transaction would not extend beyond the 10th day of the month without the consent of the owner, and with his consent, not beyond the day named by him.

2. In an action upon such contract by the broker against the owner, evidence of custom of real estate brokers as to the amount of commissions or as to the way the broker's functions are performed or when they are completed, is irrelevant.

3. Evidence that the owner refused to pay the broker, but offered as a compromise to pay a fixed amount and to give another specified amount to a church, is inadmissible under the rule that propositions made with a view to a compromise are not proper evidence. Code, §3789.

4. There was no error in refusing to give the requests in charge, and the whole charge was not error.

5. The Supreme Court will not review questions raised in the motion for a new trial, by way of exceptions to the charge, the grounds of the motion not reciting the language of the charge excepted to, but only referring to divisions of the charge numbered so and so. Cutting up a charge in this mode, merely by reference numbers to different divisions of it, so as to require the court to seek out the corresponding numbers in the charge and thus arrive at the matters complained of, is not legitimate practice.

December 7, 1891.
    v 88-21

Contracts. Real estate brokers. Evidence. Charge of court. Practice in Supreme Court. Before Judge RICHARD H. CLARK. DeKalb superior court. February term, 1891.

Reported in the decision.

DORSEY, BREWSTER & HOWELL, for plaintiff in error.
ABBOTT & SMITH, contra.

LUMPKIN, Justice.

The defendant claimed to be the owner of a certain lot in the city of Atlanta, and the plaintiffs, who were real estate brokers doing business under the name of the Atlanta Real Estate Exchange, undertook to find a purchaser for the lot. After some preliminary negotiation, a contract was drawn up in two parts as follows: "I will offer the place at $11,250 net until 10 May, 1890," signed by the defendant; "We accept the above at $11,250 net upon condition that sale is perfected," signed by one of the plaintiffs as manager. It was understood that the plaintiffs should get as compensation for their services whatever excess above the stated price they might secure at the hands of the purchaser. Under this agreement the plaintiffs found a purchaser at $12,000 on May 8th. They agreed with this purchaser to sell the lot for part cash and part deferred payments, although they had no instructions from defendant outside of those expressed in the written agreement. The purchaser paid the plaintiffs $10 to bind the bargain. The defendant's title papers were put in the plaintiffs' hands and by them turned over to the purchaser for an examination of the title. This examination was not concluded until May 13th, after the time limited in the contract had expired. But the defendant waived this, for he continued negotiations after May 10th and on the afternoon of May 14th granted an extension of the time until eleven o'clock of the following morning, giving

notice that he would then declare the trade off if the purchase money was not paid him. At that hour he called at the plaintiffs' office and demanded the money, and on failure to get it, declared that he would not sell and requested his bond for title to be returned. The defendant did not have absolute title to the lot, but held a bond for title, having paid $2,300 cash and given notes for $8,000 which were still outstanding. It seems that the purchaser desired to substitute his notes for the defendant's and thus get the benefit of the deferred payments. Some time was spent by the plaintiffs and the purchaser's attorney in endeavoring to make this arrangement. But the party holding the title required either the cash or the defendant's notes to stand. Some days after defendant had withdrawn his offer, by direct negotiation with the purchaser's attorney he sold the lot for $12,000 (to wit, $4,000 cash and the purchaser substituting his notes for $8,000 in place of defendant's) and $150 extra for the privilege of this substitution. The plaintiffs then brought this action to recover for their services $750, the excess of the price paid over that stated in the contract.

1. The parties understand their contract differently. The plaintiffs claim that it was an agreement to bring buyer and seller together within the time specified, and that their part was performed as soon as this was done, although the final sale might be consummated after the expiration of that time. The transaction on the part of the plaintiffs was conducted by a Mr. Turner who was connected with the Atlanta Real Estate Exchange. Though not so designated in the evidence, he was virtually the plaintiffs' agent in the transaction in question. He testified that he procured the option from the defendant, and found the purchaser from whom he took a payment of ten dollars to bind the trade ; he told the defendant about the trade, got the defendant's papers

and turned them over to the purchaser; and adds : " I then thought I had done all I had to do and considered my duty at an end.   That is the custom in Atlanta with real estate agents.   When they find a purchaser and bring the seller and buyer together, the agent's duty is at an end, and they are entitled to their commissions." On the other hand, the defendant claims that the contract was an option under which the plaintiffs must produce a *cash* purchaser and conclude the sale within the specified time.   The testimony is not all consistent with the plaintiffs' construction.   The practical interpretation put on the contract by the parties in their conduct is entitled to much weight.   1 Warvelle on Vendors, pp. 118, 121 (§5);  Williams *v.* McHatton, 16 La. An. 196 ; Frigerio *v.* Stillman, 17 *Id.* 23 ;  Parmelee *v.* Hambleton, 24 Ill. 605;  Purinton *v.* Northern R. R, Co., 46 Ill. 297 ; Leavers *v.* Cleary, 75 Ill. 349 ;  Chicago *v.* Sheldon, 9 Wall. 50,  54;  Topliff *v.* Topliff, 122 U. S. 121.   Now on May 8th, the plaintiffs' agent writes to the defendant in these words :  " I have sold your lot on Pryor street on option given us extending to May 10th proximo. Will see you to-morrow."   Again, we find the plaintiffs' agent, as late as May 13th or later, going once or twice with the purchaser's attorney to persuade the party holding title to accept the purchaser's notes in lieu of defendant's.   Also he had repeated conferences with the purchaser and the attorney endeavoring to arrange the matter.   Moreover, according to the defendant's undisputed testimony, it was at the urgent solicitation of the plaintiffs that he gave them an extension of time.   Evidently the plaintiffs' action in the matter did not cease when they brought buyer and seller together.   They were still actively engaged in promoting the sale, until on May 15th the defendant declared the trade off.   Indeed, after that, the defendant testified (and it was not denied) that : "On May 17th at 2 :50 P. M. Mr. Turner

called at my place of business and said his man would meet me at his office at 3:20. I refused to go, saying that the trade was at an end and had been so declared." Now the agent says that, according to the custom, their services were completed and they became entitled to their commission when they brought buyer and seller together. If so, why all this subsequent expenditure of time and toil? It may have been friendly and gratuitous service to the purchaser. But in the absence of any such explanation, it may be taken as strong evidence that the plaintiffs had not finished their part of the contract. The defendant's construction, in view of all the testimony, is the correct one. In the contract is no allusion to credit or terms of any kind. The sale was to be for $11,250 net, and in the absence of contrary specification, the universal presumption is that the sale is to be for cash. This holds good in the sale of goods. Bennett's Benj. on Sales, §706; Newmark on Sales, §270; 2 Schoul. Pers. Prop. §412; and see *Claflin* v. *Continental Works*, 85 *Ga.* 27, 43. It also applies to an offer to sell real estate. 1 Devlin on Deeds, §370; Cammeyer *v.* United Churches, 2 Sandf. Ch. 188, 243. Even if credit could be implied in a contract like this, there would be nothing to determine the character or extent of the credit. But credit will not be implied; it must be expressly stipulated for. We think it is also plain that, in order to bind the seller, the transaction would have to be completed, or at least the money realized, within the limited time. Otherwise the seller would lose the benefit of his limit. Suppose, for example, after the bargain became binding, the buyer should refuse to carry it out. Then the seller would have to await the slow outcome of a suit to enforce the sale. Such a contingency is provided against in this contract. "We accept the above at $11,250 net upon condition that sale is perfected," in connection with the offer, does not mean perfected at

some indefinite time in the future, but within the time specified in the offer. While this condition was probably inserted to negative an obligation by the brokers themselves to buy the land, it operates also in favor of the seller by reason of mutuality and of the limit fixed by him. Where no time is expressed, the law will affix the limit of a reasonable time; but it will not extend an express limit. 1 Warv. Vend. p. 156, §34; Boone, Real Prop. §382; 1 Sugd. Vend. [259] and note (l). It is clear, therefore, that the conclusion of a binding contract for the sale would not fulfill the brokers' obligation, but the sale itself must be perfected by the time limited. Were this not so, the plaintiffs would still fail, because it appears from the evidence that they did not even procure such a contract between seller and purchaser within the time. By receiving $10 from the purchaser to bind the bargain proposed by them, and giving a receipt therefor, they had perhaps bound themselves, but they could not bind the seller to the terms of credit which they offered the purchaser, without the seller's authority or consent. This authority they did not have either by the terms of their contract or by the seller's consent. The latter testifies that, when he first went to close up the matter and get his money (which was on May 10th), they wanted terms, but he told them he must have the cash, and refused to give time on any payments. This state of things continued until May 15th, when the further time given by the seller for closing the matter up expired and he declared that he would not sell. It does appear, by certain inadmissible testimony, that "it is the custom in Atlanta with real estate agents when they find a purchaser and bring the seller and buyer together, the agent's duty is at an end, and they are entitled to their commissions." But here the parties did not deal with each other under the custom, but under a special contract in writing.

It matters not that the defendant did not have absolute title to the lot. The title could have been easily obtained by him, because the evidence shows that the party holding it did not object to his notes being taken up by cash payment of the same although not then due. On the sale of land, in the absence of express agreement, the payment of the purchase money and the delivery of the title deed are concurrent acts. 1 Sugd. Vend. [239], [241]; Lennett v. Sheehan, 27 Minn. 328. But if the sale fails of consummation, the vendee, in order to recover in an action for breach of the contract, must allege and prove an offer of performance on his part by a tender of the purchase money, unless that tender was waived. 1 Sugd. Vend. (239) and notes; Maynard v. Tabor, 53 Me. 511. In like manner the vendor, in a similar action brought by him, would have to show an offer of performance by the tender of a sufficient title deed, or by offering to execute such a deed when its preparation devolved upon the vendee. Boone, Real Prop. §385; 1 Sugd. Vend. (239), note (m); Irvin v. Bleakley, 67 Pa. St. 24. But here the action is by the brokers against the vendor for their compensation under the contract. In this case, the true test whether that compensation was earned is this : Was the sale completed within the agreed time ; and if not, did the brokers within that time put the seller in a situation where, on failing to make the sale, he would have been liable to a good action by the purchaser for such failure? In other words, the sale would have to occur within the time agreed, or else be postponed beyond that time by the seller's fault. See *Hyams* v. *Miller,* 71 *Ga.* 608. It is plain that the purchaser could not maintain his action without having tendered the purchase money before the option expired. And the only fault imputed to the seller is that he did not have full title to the land, but only a bond for title with part of the purchase money paid.

This objection was not once raised during the negotiations, whose sole purpose was to get the seller's notes replaced by the purchaser's. It was never urged as standing in the way of a speedy conclusion of the sale, or as an excuse for failing to produce the purchase money when demanded. On the contrary, the plaintiffs allowed the defendant to go on demanding the purchase money, without once saying to him : "Are you ready to make title?" or "Produce your deed," or anything equivalent thereto. What they did say, however, appears in the following letter written by their agent to the defendant on the 14th of May :

"Dear Sir : Mr. D. C. Bacon [the purchaser] has just been in our office and requests me to say that Mr. Howell (his atty.) will have papers ready by 1 o'clock to-day, so you can come up at that hour and arrange for transfer and get your money."

He went at 2:30 of that afternoon, and still no money was given or tendered him. Then it was that, at their urgent solicitation, he gave the party until 11 o'clock of the next morning to pay the money. Mr. Turner assured him that all the parties would be notified, his man and all interested, to close the matter up and make transfer. Possibly the plaintiffs were hampered all along by their unauthorized agreement to give time to the purchaser on some payments, and in order to secure him this promised benefit, delayed the matter till the defendant withdrew his proposition. But if this was not the case and the purchaser was ready, as he states in his testimony he would be, to pay the balance of the twelve thousand dollars, in excess of the $10.00 already paid to the broker, his attorney having examined and approved the title, the plaintiffs could have insisted on his producing the money, and then been in a position to insist on the defendant making a title to the pur-.chaser. The defendant might have been able to take

up his notes without any aid derived from the purchase money, or he might have brought the party whose bond he held into the final conference and, by turning over so much of the purchase money as was due her, then and there gotten his deed to the lot. So far as the evidence shows, the defendant's ability to do either of these things was not tested, questioned or even doubted. If the purchaser insisted on having the time given by the plaintiffs, then the only way they could secure the benefit under their contract with the defendant was for them to advance the $11,250 themselves, take the title and carry out their agreement with the purchaser. Certainly they did not intend or wish to effect the sale in this way; but their agreement to give the purchaser time, coupled with his unwillingness or inability to pay all cash and the unwillingness of the party holding title to take the purchaser's notes in lieu of defendant's, would make it the only course open to them by which they could force the defendant to come up with the title or else be in default. Time was of the essence of the contract, and it was apparently not lost by defendant's fault but was all used up in vain efforts to procure the substitution of notes. Under these circumstances, the defendant had a right to terminate his offer and subsequently effect the sale which he made to the purchaser directly. See 1 Sudg. Vend. (257), (268) *et seq.*; 1 Warv. Vend. p. 140 (§22); Boone, Real Prop. §382; Livezy *v.* Miller, 61 Md. 336; Lipe *v.* Ludewick, 14 Ill. App. 372; Wylie *v.* Marine Bank, 61 N. Y. 415; Sibbald *v.* Iron Co., 83 N. Y. 378; McGavock *v.* Woodlief, 20 How. 221; Watson *v.* Brooks, 13 Fed. Rep. 540; *Doonan* v. *Ives,* 73 *Ga.* 295. It is true that the purchaser testified to his understanding that he perfected the trade for the place with the Atlanta Real Estate Exchange, and apparently did not know there was any rupture in the negotiations. Before this rupture took place, he had put

the matter in the hands of his attorney who testified to opening entirely new negotiations with the defendant. It may be that, but for the brokers' intervention, the purchaser would not have had his attention called to the property being for sale, and the defendant would have gone without a purchaser. But they took the risk of losing the fruits of their efforts, by taking a contract restricted in point of time, and increased that risk by offering terms of credit to the purchaser.

It follows from what has been said that the verdict was contrary to law and contrary to evidence, and the court erred in not granting a new trial on the general grounds of the motion.

2. In the 18th and 19th grounds of the amended motion for a new trial, it is complained that the court erred in admitting testimony as to the custom among real estate agents in Atlanta, that when the agent found a buyer and brought buyer and seller together, their work was done and they were entitled to their commission; and in admitting testimony that the commissions in this case, according to the charges prevailing in Atlanta, would be $350. All this is objected to as being irrelevant. The objection is well taken. The action was brought upon the written contract, and not upon the alleged custom. The custom might be material in the absence of a special agreement incompatible with it. But when there is such an agreement, the custom is superseded thereby. Lawson, Us. & Cust. p. 434 *et seq.*; Clarke's Brown on Us. & Cust. p. 81 and notes; Gibney *v.* Curtis, 61 Md. 192; Corbett *v.* Underwood, 83 Ill. 324; *Werner* v. *Footman*, 54 *Ga.* 128.

As to commissions, likewise, the plaintiff declared, not for the value of his services, but on the contract for the compensation contemplated by the contracting parties, that compensation being the excess which the plaintiffs could obtain from the purchaser procured by them

over the defendant's price of $11,250. Consequently it was irrelevant to show what the usual commission would be. *Park* v. *Piedmont Life Ins. Co.*, 48 *Ga.* 601.

3. The 17th ground of the amended motion complains of the admission in evidence, over defendant's objection, of a conversation between the plaintiffs' agent and the defendant, in which the latter offered to compromise the claim for commissions by giving the plaintiffs $600 in cash and $150 to the Presbyterian church, the objection being that the offer was made with a view to compromise. The code says in §3789 : "Admissions or propositions made with a view to a compromise are not proper evidence." This is an instance within the rule. All the testimony on this point unequivocally stamps the proposal as an offer of compromise. It appears from the charge that the court allowed the evidence to go to the jury because he could not tell whether it was in compromise until it was heard, and then left it to them to determine whether it was a compromise or intended as an admission. The rule in the code seems broader than the court treated it; for it is not only propositions, but also "admissions" made with a view to a compromise which are not proper evidence. See *McElrath* v. *Haley*, 48 *Ga.* 647. The law favors the adjustment of controversies by mutual concessions. It has no inclination to foster forensic strife, but encourages the agreement of adversaries. If the salutary rule prohibiting such admissions from being adduced in evidence be departed from, the fear of having to encounter them at the trial would deter most litigants from any effort to settle their cases. It was error to admit this testimony. *Tufts* v. *DuBignon*, 61 *Ga.* 322; *Freeman* v. *Bigham*, 65 *Ga.* 580; *Keaton* v. *Mayo*, 71 *Ga.* 650; *The Mayor* v. *Minor*, 73 *Ga.* 484.

4. The requests to charge contained in the 1st and 2d grounds of the amended motion are erroneous in as-

suming that the sale was to be made to the real estate exchange. The evidence clearly shows it was understood that the exchange should provide the purchaser, they themselves not undertaking to buy. For this reason, if not for others, these requests were properly refused.

The request in the 3d ground, touching attorney's fees, would take this part of the case entirely away from the jury, to whom the questions of bad faith, stubborn litigiousness, etc., peculiarly belong. Code, §2942. There was no error in declining such a request.

An exception to the whole charge, if any considerable part of the same be correct, is too general. Much of this charge being unexceptionable, the fourth ground of the amended motion was properly overruled. *Collins* v. *Spence*, 84 *Ga.* 503.; *Whelan* v. *R. R. Co., Id.* 506; *Thomas* v. *The State, Id.* 613; *Flemister* v. *The State,* 81 *Ga.* 768; *Small* v. *Williams,* 87 *Ga.* 681.

5. The whole charge of the court is set out under the fourth ground of the amended motion, annotated with marginal reference numbers thus, "No. 1," "No. 2," etc. up to 12. The twelve portions thus tagged with num-. bers are complained of as error in the 5th to 16th grounds (inclusive) of the amended motion. These portions of the charge are not set out in connection with the errors alleged, except that the beginning and concluding words of each portion are given in connection with its number to aid in locating each attack upon the charge. The scheme is for this court to take each number in succession, then return to the whole charge, find the number sought, extract the language objected to, carry it back to the starting-point, subject it to the criticism there made against it and then say whether the objection is well taken. Such a practice as this would needlessly increase the labor of the court at the expense of time which ought to be used in deciding, rather than

in searching for, the numerous and difficult questions raised for determination. Counsel can, by copying the portions of the charge objected to, make their points readily accessible. In *Reich* v. *The State*, 63 *Ga.* 619, it appears that exceptions were made to the charge in a fashion somewhat like that above described; the court, though not actually declining to consider the exceptions, disapproved their form and suggested copying the extracts complained of, as proper practice. In *Spinks* v. *Glenn*, 67 *Ga.* 746, the charge was cut up into parts to which the exceptions were written on the margin of the bill of exceptions, and the court condemned that fashion by refusing to review the exceptions. Under the new law for taking cases to the Supreme Court, however, the plaintiff in error is required to "specifically set out the errors complained of." Acts 1889, p. 115. This distinct requirement and the general spirit of the act forbid loose or disconnected allegations of error. For these reasons this court will not consider exceptions made in the manner adopted in this case.    *Judgment reversed.*