HYAMS vs. MILLER, trustee, et al.

Where compensation is to be paid to a broker or real estate agent
by way of commissions, the whole service or duty must be per-
formed before any right to commissions arises, unless the act of
the principal has prevented the performance of it.

(a.) Where a property owner contracted with a real estate agent that
the latter should not only find a purchaser for his property, but
also make actual sale of the same, on terms stated, before claiming
commissions, it was necessary for the agent to complete the sale;
he must find a purchaser in a situation, and ready and willing to
complete the purchase on the terms agreed on; upon doing this,
he would be entitled to commissions, although the vendor should
refuse to perfect the sale.

(b.) That the agent carried a proposition to purchase from a proposed
buyer to the owner, and the latter indorsed upon it accepted, did
not entitle the agent to commissions, where the trade was not con-
summated, without fault on the part of the principal.

December 4, 1883.

Contracts. Principal and Agent. Brokers. Commis-
sions. Before Judge RONEY. Richmond Superior Court.
April Term, 1883.

Reported in the decision.

L. PHINIZY; J. C. C. BLACK, for plaintiff in error, cited,
on commissions of real estate agents, 2 Wait's Act. & Def.,
282 and cit., 283; 51 N. Y. (6 Sick.), 124; 58 Id., (13 Id.),
683; 55 Id., (10 Id.,), 319; 104 Mass., 204; 10 Am. R.,
431; 60 Ga., 212; 2 Suth. Dam., 449, 450; 14 C. L.
Jour., 36; 9 Id., 295; 4 Stew., N. Y., 59; 7 C. L. Jour.,
187; 44 Wis.,    ; 21 Am. R., 192 and cit.; 5 C. L. Jour.,
409; 16 Id., 442.

FOSTER & LAMAR, for defendant, cited 20 How., 227; 13
Ga., 214 (2); 17 Id., 344; 14 Id., 134 (3); 32 Id., 493;
36 Id., 431; Hilliard Sales, 35, 36; 1 Benj. Sales, 1, 2; 23
Miss., 384; 1 Wait's Act. & Def., 270; 31 Md., 250, (1 Am.
R., 49); 29 Id., 512; 12 Gray, 491; 101 Mass., 255; 13 La.
Ann., 151; 43 Barb., 529; 68 Penn. St., 42; 21 Barb., 145;

4 Daly, 143 ; 52 Mo., 249; 34 Md., 440 ; 43 Cal., 306 ; 46 Conn., 136 ; 1 C. B. (N. S.), 296 ; 10 B. & C., 438.

BLANDFORD, Justice.

Plaintiff in error brought his suit in Richmond superior court to the October term, 1882, against Leroy J. Miller, as trustee of his wife, Mary T. Miller, and her trust estate, and Josiah Miller, and the said Leroy J. Miller. He alleged that on the 14th of September, 1881, he was, and for a long time had been, a real estate agent in the city of Augusta, engaged in buying and selling real estate for others upon commission; that on said day and year he, as such agent, received from said Leroy J. Miller, trustee, his written letter of authority, authorizing him to sell a certain piece of real estate (a copy of which letter appears below). He further alleged that, in pursuance of said authority, on said day and year, he procured a purchaser for said property in the person of one Lexius Henson of said city, and then and there obtained from said Henson his written agreement to purchase said property (a copy of which agreement appears below), that said written agreement of said Henson was presented by him to the said Leroy J. Miller, and that the same was accepted by him on said day and year, by his entering upon the face of the same his acceptance as follows : "Accepted September 14, 1881, L. J. Miller, trustee." That at the time of the sale and the procuring of said purchaser, he believed all of said property belonged to said Leroy J. Miller, trustee, but since ascertained that only a portion of it did so belong, the other portion belonging to said Josiah Miller, who had authorized the said Leroy J. Miller to sell his said portion along with that of the trust estate, and that in conferring authority to sell and accepting the bid of said Henson, said Leroy J. acted not only as trustee, but as the duly authorized agent of the said Josiah. That valuing the whole of said property at $25,000, that of the trust estate was worth $18,000,

and that of said Josiah was worth $7,000. Petitioner prayed that, in the event that the court should hold that the said Josiah Miller was not liable, that the said Leroy J. Miller might be held liable, and that if the court so directed, the parties might be required to interplead and determine among themselves their respective liabilities, and for such other and further relief as he might be entitled to in the premises.

Defendants demurred to the petition, upon the following grounds, to-wit:

(1.) That there is no sufficient cause of action set forth in his declaration.

(2.) That there is no sufficient cause of action set forth against Leroy J. Miller, trustee, and no cause of action that can bind the trust estate.

(3.) That there is an improper joinder of causes of action in said declaration.

(4.) That there is an improper joinder of parties.

(5.) That said declaration is bad for uncertainty.

(6.) That in said declaration there are improper prayers for relief.

(7.) That there is a want of proper parties.

Which demurrer the court overruled, and defendants excepted and assigned error by interlocutory bill of exceptions. The jury returned a verdict for defendants. Motion for new trial was made, upon the following grounds:

(1.) Because the verdict in said case was contrary to the evidence.

(2.) Because the verdict was against the weight of the evidence.

(3.) Because the court erred in charging the jury this, viz: That a real estate broker is not entitled to his commissions until he produces a purchaser in a situation, and ready and willing to complete the sale.

(4.) Because the court erred in charging the jury, that it was the duty of Hyams to disclose to Miller everything that passed between himself and the purchaser in refer-

ence to the trade, and if he did not, then it was a fraud on Miller, and he could not recover.

(5.) Because the court charged the jury, if they found this transaction to be a bargain and not a sale, this was the end of the case, and they must find for the defendant.

(6.) Because the court erred in charging the jury that the broker must not only find a purchaser who was ready and willing, but one pecuniarily able to purchase.

(7.) Because the court erred when it qualified plaintiff's written request to charge, in these words: " But you must believe from the evidence that there was a sale;"—the request to charge being in these words: " If the plaintiff was employed as a broker and effected a bargain and sale by a contract mutually binding on the vendor and vendee, he is entitled to his commissions, whether the employer chooses to comply with or enforce the contract or not, unless you believe he otherwise agreed."

This motion for new trial was refused, and plaintiff excepted.

The following evidence was introduced:

For plaintiff—*Mr. Hyams :*—Am real estate agent and broker. Identifies agreement of September 14, 1882, of L. J. Miller, trustee, authorizing him (Hyams) to sell property therein described. Also instrument of same date, signed Lexius Henson. Upon receipt of the offer from Henson I took it to Miller, and he wrote the acceptance which appears upon the face of it. Some time afterward I sent my account to Mr. Miller for $1250, 5 per cent upon the sum named in the writings. Mr. Miller did not pay— refused to pay it, and sent it back to me. The amount is still due me.

*Cross-examination :*—Henson did not take the property. Did not pay the whole or any part of the sum offered. I did not collect any of the agreed purchase money. (The sale was never completed.) The property is still owned by the defendants. I claim that my commissions were due when I obtained Henson's written offer for the prop-

erty, and Miller indorsed his acceptance of it thereon. It was nothing to me afterwards whether the sale failed of completion or not. Miller was satisfied with Henson as a purchaser. I know that he was satisfied with him, because my negotiations with Henson for the purchase of the property had been going on for several weeks, and Miller knew to whom I was trying to sell the property. Miller had tried to sell the property to Henson before he put it in my hands for sale. It was not my agreement with Miller that my commissions were to be paid from the proceeds of the sale, and as the payments were made; they were to be paid in one payment, when the sale was made. Henson did not say to me that he did not have the money with which to pay for the property. He did say to me that he thought he could borrow the money. I think I did say to him, in the course of the negotiations, that Mr. Davison would let him have the money, and that Mr. Davison was then at Beaufort, and would return in two or three days, when he could get the money from him. Henson did not say to me that he would take the property, if he could borrow the money. Both, the contract with Miller for the sale of the property and Henson's offer of purchase are in my handwriting. After Henson had agreed to purchase, I went to my office, wrote out the offer, and took it to his (Henson's) restaurant, where he signed it. I then took it to Miller; he indorsed his acceptance thereon. I did not give the written offer of Henson to Miller, but showed it to him; kept it myself; have had it ever since. No deed was ever presented to Miller for his signature, or a deed demanded of Miller so far as I know. I did not repeat to or inform Miller of any conversation I had with Henson touching the purchase of property, or the offer by Henson.

"AUGUSTA, GA., September 14th, 1881.

" *Mr. M. Hyams, Esq.*:

"DEAR SIR—I authorize you to sell my property, located on the south side of Broad street and running through to Ellis street, known as "Miller," with improvements on Broad and Ellis streets, for twenty-five thousand ($25,000) payable as follows: $5,000 cash, bal-

ance in one, two and three years, with 8 per cent interest on the deferred payments. Rents to be transferred to the purchaser from the date the cash payment is made; possession of the property to be given October 1, 1882, except the store; and the purchaser can make his own arrangements with the present tenant, E. D. Smythe & Co., for possession of said store; purchaser to pay for papers. I will give you five per cent. (5) commission on the gross sales.

Very respectfully,     L. J. MILLER."

" AUGUSTA, GA., September 14th, 1882.

"*Mr. Hyams, Esq.:*

" DEAR SIR—I will give you for the property located on the south side of Broad street and running through to Ellis street, known as " Miller," with improvements on Broad and Ellis streets, twenty-five thousand dollars, payable as follows: $5,000 cash, balance in one, two and three years, with 8 per cent interest on the deferred payments. Rents to be transferred to me from the date I make the cash payment, and possession of the property to be given me October 1, 1882, except the store. I will make my own arrangements with the present tenants, E. D. Smythe & Co., for possession of said store. I will pay for papers. Very respectfully,

LEXIUS HENSON."

" Accepted September 14, 1881.

L. J. MILLER, Trustee."

Deed from John T. Shewmake, trustee, to L. J. Miller, trustee, dated March 14, 1871, giving him power to sell, which was admitted.

Deed from Z. Daniel, assignee, to Josiah Miller, dated as follows: The title to Josiah Miller as alleged in petition was admitted.

*W. C. Jones :*—Knows the Miller property; thinks the Broad street property worth $18,000, and Ellis street half, worth $7,000. I so assess for city taxation.

*Cross:*—Am city taxation assessor. Lexius Henson returned, and was assessed for taxation for 1880, property worth $3,000; in 1881, $1,600; in 1882, $1,300; all on stock and fixtures in bar-room and restaurant.

For defendant—*L. J. Miller :* Put property in Hyams' hands for sale at price named, $25,000; payments to be made as stated in the authority given in writing, dated September 14, 1881. Hyams was to sell the property, have the titles made out without cost to me, and upon the

Hyams *vs.* Miller, trustee, *et al.*

gross receipts of the sale I was to pay him 5 per cent, as the payments were made. This was my distinct agreement with Hyams, to pay his commissions from the money received from the sale of the property, and as the several payments were made. There has never been any sale of the property. Hyams brought me the paper signed by Henson agreeing to buy the property, and asked me to write my acceptance of it across it, which I did. He took the paper away with him, and failing to hear anything from him for two or three days about the matter, I went to see him, and asked him if Henson had paid the first installment. He said no, that the gentleman who was to lend Henson the money was absent from the city, but would return in a few days, when he would close up the matter. In the following two weeks I called on Hyams perhaps half a dozen times, each time inquiring the cause of the delay in paying the money and preparing papers. On each occasion the cause of the delay was said to be the absence of the gentleman who was to lend Henson the money, and that everything would be made all right upon his return. I became satisfied that the sale had failed, and concluded to wait until Hyams should complete the trade by getting the first installment and presenting me the deeds to sign. I heard no more from Hyams until some time in December, just prior to the bringing of this suit, when he sent me a bill for $1,250, commissions for selling the property. I then saw the game he was trying to play on me, and I sent the bill back to him with the statement that he hadn't sold the property, but that when he did, his commissions would be due and paid. I heard no more from him until this suit. Hyams' statement that I knew he was negotiating with Henson for the purchase of the property prior to his presenting the offer from Henson, is not true; nor was his statement true that I had been trying to sell the property to Henson before putting it in his hands for sale. I had no knowledge or idea of who, if anybody, was negotiating with Hyams for the pur-

chase of the property prior to his presenting Henson's offer to me for the acceptance. The acceptance which I wrote upon the offer was simply that I was willing to comply with the terms of the authority given Hyams to sell to Henson as a purchaser, upon his paying the cash payment, and otherwise complying with the provisions as to purchasing. I had no idea of accepting Henson's offer upon any other terms, or of releasing Hyams from his part of the contract to sell the property, prepare papers, etc. Hyams never, at any time, in any of our conversations, made any such claim, but in each and every interview referred to Mr. Davison's absence as the cause of the delay in collecting the first installment, and preparing the necessary papers for my signature, and promised to do so as soon as Mr. Davison returned.

*Cross :*—The agreement as to commissions was as I stated. They were to be paid from the money realized from the sale of the property—5 per cent of each payment upon the receipt of the money. I was compelled to make this arrangement, because I had no money to pay otherwise, and Hyams knew it, for I so informed him at the time of making the agreement. I only know why Henson failed to take the property from what he told me since this suit was brought. Never spoke to him upon any subject connected with the property before this suit was brought. I never attempted to sell it to him. Never spoke to him on the subject. I did not think that he had either the means or inclination to purchase it. Hyams did not tell me of any conversation he had with Henson.

*Re-direct :*—Hyams did not tell me that Henson's written offer was conditional upon his being able to borrow the money. I knew nothing whatever of what passed between Hyams and Henson. . Hyams brought the written offer to me, and requested me to accept it across the face, which I did. The store on Broad street was under lease to E. D. Smythe & Co., with three years to run, at the

time of the offer of Henson. Have no children. I had authority sell both lots.

*Lexius Henson* :—About the date of this paper (offer of Henson) Hyams came to see me, and offered to sell me the Miller property; priced it to me at $25,000—$5,000 to be paid cash, balance in one, two and three years, with interest,—saying it was a better stand for my business. I told him I did not have the money. He said you can borrow it from Mr. Davison. I said I didn't know about that. Hyams says, oh yes, you can; after some further talk on the subject, I said to him, if I can borrow the money I'll take the property at the price named. He did not mention to me that the store was under lease, and that I could not get possession of the store until the expi-ration of the lease. If he had, I should not have consid-ered the proposition at all. My idea and purpose was to move into the store and Broad street building the first of October, then near at hand. Hyams pressed the matter on me from the start. Would not give me time to think; said if I got the property I would have to act that day, as Mr. Harry King was hot after him for it, but he wanted me to have it. He left me, and came back to my place of business about two o'clock, when I was very busy with my customers at dinner; pulled out a paper, and said that in order to keep King from getting in ahead of me and buying the property, he had put the matter in writing, and asked me to sign it. I told him how busy I was, and asked him to call again, but he kept pressing me to sign the paper, saying if I did not Mr. King would step in ahead of me. I started to read the paper, but my business call-ing my attention away, under the impulse of the moment, I took up a pen and signed it. That evening, after the rush of dinner was over, I went around to see Hyams about the matter, and then learned that he had deceived me about the stores, that I could not get possession of them for several years, which would defeat my purpose in pur-chasing, and I promptly informed Hyams that he had mis-

led me, as I had stated to him that if bought I would want possession October 1; that the property was worthless to my business without the first floor, and that I would not take the property or have anything to do with it. He never mentioned the subject to me after that interview. Hyams took the advantage of me all the way through, and shoved me into the matter faster than I wanted to go. Miller never offered me the property for sale at any time. He never spoke to me upon the subject of the property, or my refusal to purchase until after this suit. He then asked me why I had not completed the purchase? I told him how Hyams had deceived me, and repeated to him about what I have here stated. I did not complete the purchase for reasons stated; paid no part of the price offered.

*Cross:*—After the return of my friend, I went to him to get money to buy the property. This was several days after contract was signed.

*Hyams, recalled in rebuttal :*—Henson gave me as one of the reasons why he did not complete the purchase, that Mr. Miller and Mr. Alexander objected to his opening a bar-room and restaurant next door to them, and would sue out an injunction against him, if he undertook to open there. I carried the offer for Henson to sign to his place of business, between 12 and 1 o'clock; found him sitting at his desk; handed him the paper; he read it, signed it, and handed it back to me, when I took it around to Miller for his signature, and he signed it and accepted it on the 14th of September, 1881. Miller knew Henson, lived in fifty yards of his place of business, and had known him for years back. Knew him as well as I did. I deny that I told Henson to buy the property upon the condition that he could borrow the money. Never would have sold it to him on this condition, because it would have been in violation of the written agreement, etc. My fee was to come from the sale of property and not from partial payments. Never did sell property in that way; when bargain and

Hyams vs. Miller, trustee, et al.

sale is made, I consider my fees earned. Never promised to see after papers or deeds. This is not the business of a real estate man. Henson was anxious to buy the property, and had seen Miller before frequently. He signed the paper of his own accord, and said he thought he would be able to do a big business there. He afterwards told me why he did not pay the money, and gave two reasons : 1st. Because the adjoining parties would object; but 2d. (and this was his chief reason) his friend, Mr. Davison, told him he had made a bad trade and paid too much, and he had better let it alone. The statements made by Miller as to the trade are not true ; he did try to sell it to Henson before I took it in charge, and he asked me afterwards. to help him all I could to make Henson pay down the money.

Under the facts of this case, was the plaintiff entitled to recover ? We think not. The contract between these parties was, that the plaintiff was not only to find a purchaser for defendant's property, but he was to make actual sale of the same upon the terms proposed by defendant. Plaintiff's taking the proposition and acceptance of Henson to defendant, and the same being accepted by defendant, did not make him liable to plaintiff for commissions, the sale not being consummated. The undertaking of plaintiff was to make sale of defendant's property, upon the terms proposed and submitted by defendant. Until this was done, plaintiff was not entitled to commissions, nor was defendant liable to pay any.

The rule is, as we understand it, where the compensation is to be paid by way of commissions, the whole service or duty must be performed before any right to commissions arises, unless the act of the principal has prevented the performance of it. 1 Wait's Act. & Def., 270 ; 101 Mass., 257 ; 54 Penn. St., 394 ; 3 Hun, 152 ; 56 N. Y., 289 ; 27 Vt., 127 ; 99 Mass., 170.

In the case of McGavock vs. Woodlief, 20 Howard, 227, the Supreme Court of the United States laid the rule down thus: "The broker must complete the sale; that is, he must

find a purchaser in a situation, and ready and willing to complete the purchase, on the terms agreed on, before he is entitled to his commissions. Then he will be entitled to them, though the vendor refuse to go on and perfect the sale." 10 B. & C., 438.*

" Applying these principles to the case before us, the verdict and judgment of the court below was right, and the same is affirmed.

Judgment affirmed.

---

*On commissions of real estate agents, see Albany L. J., vol. 26, No. 21, p. 413; Ibid., vol. 26, No. 23, p. 454, and citations; Holdridge vs. Cubbedge et al. (September Term, 1883). (Rep.)